FILED
United States Court of Appeals
Tenth Circuit

July 29, 2011

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JAMES RIVER INSURANCE
COMPANY, an Ohio corporation,

Plaintiff - Appellant,

v.

RAPID FUNDING, LLC, a Colorado
limited liability company,

Defendant – Appellee.

No. 10-1145

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:07-CV-01146-CMA-BNB)**

---

Andrew M. Low (Richard P. Holme and Kyle W. Brenton, with him on the briefs), Davis Graham & Stubbs LLP, Denver, Colorado, appearing for Appellant.

Diane Vaksdal Smith (Michael S. Burg, David K. TeSelle, and Thomas W. Henderson, with her on the brief), Burg Simpson Eldredge Hersh & Jardine, P.C., Englewood, Colorado, appearing for Appellee.

---

Before **TYMKOVICH, BRORBY,** and **MATHESON,** Circuit Judges.

---

**MATHESON**, Circuit Judge.

# I. INTRODUCTION

This case arose from a fire that destroyed a dilapidated Michigan apartment building. The owner of the building, Rapid Funding, LLC, a Colorado limited liability company, submitted a claim to its insurer, James River Insurance Company, an Ohio corporation, for the full $3 million of insurance coverage the policy carried. James River denied the claim because it determined that the building's pre-fire value was less than zero. Rapid Funding brought a diversity action against James River in Colorado federal district court for breach of contract and insurance bad faith and won $3 million in compensatory damages and $2.35 million in punitive damages.

James River argues on appeal that the damages verdict was based on valuation testimony that the district court should have excluded under Federal Rule of Evidence 701. James River seeks a new trial on damages or remittitur of the damages verdict. Rapid Funding counters that Colorado law, not the Federal Rules, should govern this issue and that the testimony was admissible under Colorado law. Rapid Funding adds that, even if the testimony were erroneously admitted, the error was harmless because other evidence supports the jury's damages verdict.

Rapid Funding cross-appeals the district court's dismissal of its claim for new damages under a Colorado statute that went into effect after James River refused payment. The new statute allows an insured whose claim for payment of benefits has been unreasonably delayed or denied to receive two times the covered benefit plus court costs and attorney fees. *See* C.R.S. § 10-3-1116. Rapid Funding argues that James

River's failure to pay out the claim after James River unearthed new information in discovery constituted a new act of bad faith that occurred after the statute went into effect.

We hold that the valuation testimony was erroneously admitted, that the Federal Rules of Evidence apply, and that the error was not harmless. We therefore REVERSE and REMAND for a new trial limited to the issue of damages. We AFFIRM the district court's dismissal of Rapid Funding's claim for new damages under C.R.S. § 10-3-1116.

## II. BACKGROUND

### A. *Facts*

Amsterdam Gardens, a complex of apartment buildings in Wyoming, Michigan, was constructed in 1969. The complex was divided into the North Building and the South Building, which were roughly equivalent in value.

The City of Wyoming condemned Amsterdam Gardens for building code violations in 2003. The next year Robert Rice and Robert Niebauer bought the complex for $2.6 million. To finance the deal, they borrowed $2.08 million in a mortgage loan from Rapid Funding, payable in one year. Mr. Rice sold his interest in the property to Mr. Niebauer, but remained jointly and severally liable for the debt to Rapid Funding.

Mr. Niebauer defaulted on the loan, and Rapid Funding filed for foreclosure. Because Rapid Funding intended to purchase the complex at the foreclosure sale, it sought insurance for the property from James River.

On October 12, 2006, James River issued a $3 million policy effective

-3-

immediately. The coverage allowed Rapid Funding to make a claim for either the property's replacement cost or its actual cash value. The actual cash value option allowed Rapid Funding to recover the value of the property without rebuilding it.

Meanwhile, Rapid Funding also retained Jeffrey Genzink, an appraiser, to value the property. Mr. Genzink told Rapid Funding the land was worth an estimated $1.12 million. He could not, however, estimate the value of the buildings because he could not find sales of comparable buildings and did not know if the buildings had lost structural integrity.

Rapid Funding purchased Amsterdam Gardens at the sheriff's foreclosure sale for $1.8 million. The company then put the complex up for sale and received offers between $1.0 and $1.2 million. Rapid Funding later agreed to sell the complex back to Mr. Rice for $1.8 million and to forgive his $650,000 debt to Rapid Funding.

On January 24, 2007, before the sale to Mr. Rice was completed, an arson fire burned the North Building to the ground. The City of Wyoming ordered Rapid Funding to demolish the remainder of the North Building. Rapid Funding demolished the North Building, and James River paid for the demolition. The City of Wyoming also ordered Rapid Funding to rehabilitate the South Building into compliance with the building code or to destroy it. Rapid Funding demolished the South Building.

Andrew Miller, Rapid Funding's principal, hired a construction company, Anderson Group International, to estimate the replacement cost of the North Building. The Anderson Group report concluded that it would cost approximately $7.145 million to

replace the North Building. In March and May 2007, Rapid Funding, through Mr. Miller, submitted two Proofs of Loss to James River. They both claimed the North Building had an actual cash value of $4.489 million before the fire. According to Mr. Miller, this figure was based on applying a 40% depreciation factor to the Anderson Group's estimate of the replacement cost.

On May 30, 2007, James River denied the claim after concluding the North Building had no value.

**B.** *Procedural History*

One day later, James River filed suit in Colorado federal district court and asked for a declaratory judgment that it owed nothing on Rapid Funding's actual cash value claim. Rapid Funding counterclaimed for breach of insurance contract and breach of the covenant of good faith and fair dealing.

**1.** *Pretrial Motions*

James River filed a motion in limine under Federal Rule of Evidence 702 to exclude testimony that Andrew Miller planned to offer on the value of the North Building. The district court held an evidentiary hearing to determine if Mr. Miller's testimony was admissible under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See James River Ins. Co. v. Rapid Funding, LLC*, No. 07-cv-01146-CMA-BNB, 2009 WL 481688 (D. Colo. Feb. 24, 2009).

The district court found, over James River's objection, that Mr. Miller was qualified to offer opinion testimony on the value of property given his experience in real

estate.  *See id.* at *5-7.  The court added that, although additional qualifications beyond that experience were not required, Mr. Miller was especially well-suited to value property that his company owned and that he had inspected.  *Id.*  But the court decided not to admit Mr. Miller's valuation testimony under Rule 702 and *Daubert* because it was not based on sufficient facts or data, was not the product of reliable principles and methods, and the method he did use was not reliably applied in this case.  *Id.* at *7-12.

At the hearing, Mr. Miller explained he intended to testify that the North Building had an actual cash value of $4.489 million.  *Id.* at *2.  He based his valuation on the $7.145 million replacement cost estimate from the Anderson Group and a 40% depreciation factor.  *Id.* at *8.  To calculate the 40% depreciation rate, Mr. Miller "divided the amount of money it would cost to rehabilitate each unit in the North Building before the fire to like new condition, $20,000, by the amount it would cost to completely replace each unit," which he stated was $50,000.  *Id.*

The district court said that the $50,000 per unit rehabilitated value had very little foundation.  *Id.*  The court also explained, "when asked how he arrived at the $20,000 pre-fire rehabilitation estimate, Mr. Miller stated that he has 'a feeling' about how much it would cost to rehabilitate each unit to like new condition."  *Id.*  The court concluded, "*Daubert* and Rule 702 require more than a 'feeling.'"  *Id.*

The court also examined the reliability factors articulated by the Supreme Court in *Daubert*, which include:

(1) whether the method is susceptible to testing and has been subject to such

testing; (2) whether the method has been subjected to peer review; (3) whether there is a known or potential error rate associated with the methodology used; and (4) whether the relevant community of experts has accepted the expert's theory.

*Id.* at *10 (paraphrasing *Daubert*, 509 U.S. at 593-94). The court found the factors counseled against admitting Mr. Miller's testimony. *Id.* at *12.

James River later filed a motion in limine for an order "excluding evidence and arguments relying on, referencing, or in support of Andrew Miller's opinion regarding valuation." ROA, Vol. 2 at 403. At a hearing before the district court, Rapid Funding stated that it intended to offer Mr. Miller's valuation as lay opinion testimony under Rule 701. Rapid Funding argued that Mr. Miller had a right to explain how he arrived at the Proofs of Loss. The district court characterized Rapid Funding's proposal as an "oral motion," and Rapid Funding agreed. *Id.*, Vol. 5 at 1074-75.

The district court ruled on this issue by denying James River's motion in limine. The court said:

> I think that [Mr. Miller's] testimony here is relevant to his explanation as to how [he] came up to the number for his claim.
>     So while he is not going to be able to testify as an expert on valuation, and I'm trying to figure out how I can mesh these two rulings. I think the only way that we can do it, because I think he has a right to testify as to how he came up with his claim, the number for his claim, is that I am going to have to have a limiting instruction that is given to the jury that he is . . . not testifying as an expert, and that this is essentially just a lay opinion . . . given by him.

*Id.* at 1107.

On August 5, 2008, C.R.S. § 10-3-1116 went into effect. This Colorado statute permits an insured to sue an insurer for unreasonable denial or delay of benefits for twice

the covered benefit plus court costs and attorney fees. Rapid Funding added a counterclaim under the new statute, and James River moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). The district court granted James River's motion and dismissed the claim.

### 2. *Trial*

When Mr. Miller testified at trial, James River raised its objection again. The Proofs of Loss—to which the parties had stipulated—came into evidence. Mr. Miller testified to the $7.145 million replacement cost estimate from the Anderson Group, to his 40% depreciation figure, and his actual cash value estimate of $4.489 million. The court instructed the jury that Mr. Miller was testifying as a lay witness, not as an expert.

Mr. Miller also testified that Rapid Funding purchased the complex at the sheriff's foreclosure sale for $1.8 million and that, when Rapid Funding put the complex up for sale, it received offers between $1.0 and $1.2 million. Mr. Rice testified to buying the complex for $2.6 million, and Mr. Miller testified that Rapid Funding had contracted to sell the complex back to Mr. Rice for $1.8 million and forgive his $650,000 debt to Rapid Funding.

John Meyer, an expert appraiser who worked for James River, testified that the complex would be worth $6.6-7.0 million under habitable conditions. But after applying what he called a "habitability factor" of $8.25 million to account for the cost of restoring the buildings to a habitable condition, he concluded the value of the complex before the fire was less than zero. He also testified that the land was worth $1.3 million and that the

North Building and the South Building had approximately the same value.

In addition to presenting testimony from Mr. Miller, Rapid Funding called Edward Reilly as an expert. He criticized the use of a habitability factor and testified that in his 55 years as an adjuster he had never seen an insurance company determine that an insured property was worth less than zero. James River offered into evidence the video deposition testimony of Mr. Genzink, Rapid Funding's appraiser. Mr. Genzink said the value of the land was $1.12 million.

In testimony on which Rapid Funding would later rely for its C.R.S. § 10-3-1116 argument, Anne Marie Marson, James River's chief claims officer, testified that she continued to review information on Rapid Funding's claim up until the time of trial.

The jury found James River liable for breach of insurance contract and bad faith and awarded Rapid Funding $3 million in compensatory damages and $2.35 million in punitive damages. The $3 million was the maximum amount of compensatory damages that Rapid Funding could have been awarded under the insurance policy limit.

### 3. *Post-trial Motions*

After trial, James River moved for remittitur or a new trial on the grounds that Mr. Miller's valuation testimony was erroneously admitted and that no other evidence was sufficient to support the jury's verdict. The district court denied the motion, holding that it did not err in admitting Mr. Miller's testimony under Rule 701. *See James River Ins. Co. v. Rapid Funding, LLC*, No. 07-cv-01146-CMA-BNB, 2010 WL 965523 (D. Colo. Mar. 16, 2010) at *2. The court added that, even if the testimony were admitted

erroneously, it was harmless error because the jury could have reached its damages result by relying on Mr. Meyer's $6.6-7.0 million figure and disregarding his $8.25 million habitability factor. *Id.* at *3.

Rapid Funding moved for a post-trial award of damages under C.R.S. § 10-3-1116 because Ms. Marson's testimony proved that James River committed new acts of bad faith after the August 5, 2008 date when the new statute went into effect. The court denied this motion, finding that Rapid Funding's argument was substantially the same as Rapid Funding's pretrial motion. *See id.* at *5.

This appeal and cross-appeal timely followed. Because the district court entered a final judgment, we have jurisdiction pursuant to 28 U.S.C. § 1291.

### III. DISCUSSION

**A.** *Issues and Standards of Review*

First, we address whether the district court properly admitted Andrew Miller's valuation testimony. "We review a district court's determination regarding the admissibility of evidence under an abuse of discretion standard." *United States v. Contreras*, 536 F.3d 1167, 1170 (10th Cir. 2008) (ruling on whether evidence was properly admitted under Federal Rule of Evidence 701). If we conclude that the district court abused its discretion in admitting the testimony, we must then determine whether the error was harmless. "An erroneous admission of evidence is harmless unless it had a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect." *United States v. Yeley-Davis*, 632 F.3d 673, 685 (10th Cir. 2011) (quotation

omitted).

The same standard of review applies to the district court's rulings on James River's proposed remedies. "We review the district court's decision to deny a new trial or remittitur under an abuse of discretion standard." *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1251 (10th Cir. 2000).

Second, we address whether the district court erred in dismissing Rapid Funding's motions to add a claim for new damages under C.R.S. § 10-3-1116. The district court's decision required an interpretation of C.R.S. § 10-3-1116. *See James River*, 2010 WL 965523 at *5. "This court's review of district court statutory interpretation is de novo." *Wedelstedt v. Wiley*, 477 F.3d 1160, 1165 (10th Cir. 2007). Because C.R.S. § 10-3-1116 is a Colorado statute, we must ask how the Colorado Supreme Court would interpret it. "To properly discern the content of state law, we must defer to the most recent decisions of the state's highest court." *Kokins v. Teleflex, Inc.*, 621 F.3d 1290, 1295 (10th Cir. 2010) (quotation omitted).

**B.** *Inadmissibility of Mr. Miller's Valuation Testimony*

On appeal, James River argues that Mr. Miller's valuation testimony was inadmissible under Rule 701. Rapid Funding responds that the testimony should have been admitted under the Colorado landowner rule and that, even if the testimony were erroneously admitted, the error was harmless. We first explain that because Mr. Miller's valuation testimony was based on technical or specialized knowledge, it should not, as expert testimony, have been admitted under Rule 701. We next determine that,

-11-

regardless of whether federal or Colorado evidence law applies, his testimony would still not be admissible. We then find that the district court's erroneous admission of this testimony was reversible and not a harmless error.

### 1. *Inadmissibility under Rule 701*

Federal Rule of Evidence 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

In ruling on James River's "Motion for a New Trial, Judgment as a Matter of Law, or Remittitur," the district court defended its decision to allow Mr. Miller to testify based on Rule 701. *See James River*, 2010 WL 965523 at *1-3. The court explained that its pretrial exclusion of Mr. Miller's testimony under Rule 702 did not preclude its admission under another rule, in this case Rule 701. *Id*. at *2.

The district court also pointed to the advisory committee's note to Rule 701, which states that "most courts have permitted the owner or officer of a business to testify to the value . . . of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert." *Id.* (quoting Fed. R. Evid. 701 advisory committee's note, 2000 amendments). The court noted that it instructed the jury that Mr. Miller was not testifying as an expert. The instruction, the court said, "obviated the risk that the jury impermissibly considered Mr. Miller an 'expert.'" *Id.*

On appeal, James River argues that Mr. Miller's valuation testimony was inadmissible under Rule 701(b) because it was unreliable—as evidenced by the district court's analysis not to admit it under Rule 702—and therefore unhelpful to the jury. James River also argues that the testimony was inadmissible under Rule 701(c) because it was Rule 702 expert testimony. James River cites the advisory committee's note to Rule 702, which states, in part, that "within the scope of the rule are . . . the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values." Fed. R. Evid. 702 advisory committee's note. James River also emphasizes that Mr. Miller's testimony was based in part on a technical report by the Anderson Group and his own specialized experience as a real estate developer.

In response, Rapid Funding makes no argument on appeal that Mr. Miller's valuation testimony was properly admitted under the Federal Rules of Evidence. Rapid Funding's brief relies instead on its Colorado landowner rule and harmless error arguments.

We need not reach James River's Rule 701(b) argument because Mr. Miller's valuation testimony was expert opinion testimony based on technical or specialized knowledge and therefore inadmissible under Rule 701(c). As we have said, Rule 701 "does not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness." *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 846 (10th Cir. 1979).

Mr. Miller's opinion was based on technical or specialized knowledge. He

attempted to calculate a post-fire estimate of the pre-fire value of a dilapidated, condemned, 39-year old building. Four reasons support our conclusion that this testimony fell outside the category of lay opinion.

First, Mr. Miller's testimony did not qualify as lay opinion under Rule 701. Rule 701 allows lay witnesses to offer "observations [that] are common enough and require . . . a limited amount of expertise, if any." *United States v. VonWillie*, 59 F.3d 922, 929 (9th Cir. 1995). The Third Circuit has explained:

> The prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences.

*Asplundh Mfg. Div. v. Benton Harbor Eng.*, 57 F.3d 1190, 1196 (3d Cir. 1995).

Two Tenth Circuit cases illustrate the difference between Rule 701 lay opinion testimony and Rule 702 expert testimony. In *Bryant v. Farmers Insurance Exchange*, 432 F.3d 1114 (10th Cir. 2005), we held that a witness should have been permitted under Rule 701 to testify to elementary mathematical operations:

> Taking a simple average of 103 numbers, though technically a statistical determination, is not so complex a task that litigants need to hire experts in order to deem the evidence trustworthy. A mathematical calculation well within the ability of anyone with a grade-school education is, in our opinion, more aptly characterized as a lay opinion under Fed. R. Evid. 701.

*Id.* at 1124.

In *LifeWise Master Funding v. Telebank*, 374 F.3d 917 (10th Cir. 2004), we found inadmissible under Rule 701 a CEO's testimony about his business's lost profits because

his results were based on more sophisticated economic models. "The model concerned moving averages, compounded growth rates, and S-curves. [The witness] could not testify about these technical, specialized subjects under Rule 701." *Id.* at 929. We explained that "a person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person." *Id.* (quotation omitted).

Mr. Miller's testimony more closely resembled the testimony in *LifeWise* than in *Bryant*. Unlike taking an average, calculating depreciation requires more than applying basic mathematics. Technical judgment is required in choosing among different types of depreciation. *See E.I. DuPont de Nemours & Co, Inc. v. Robin Hood Shifting & Fleeting Serv., Inc.*, 899 F.2d 377, 381-82 (5th Cir. 1990) (explaining "straight-line" and "progressive" depreciation); *see also Dickler v. CIGNA Prop. and Cas. Co.*, 957 F.2d 1088, 1099 (3d Cir. 1992) (explaining that "a dispute exists over whether the term depreciation implies only physical depreciation or includes a broader concept including obsolescence and economic and functional depreciation." (quotation omitted)). Moreover, Mr. Miller had to do more than calculate depreciation for a 39-year old building. He also needed to account for the deterioration and neglect that caused the North Building to be condemned. Accurately accounting for the interaction between depreciation and damage requires professional experience and is beyond the scope of lay opinion testimony.

Second, Mr. Miller's calculations were based in part on his professional

experience in real estate. Rapid Funding argues that, as "a licensed real estate broker," Mr. Miller was better situated than most owners to make this determination. *See* Aple. Br. at 33. Instead of supporting the admissibility of Mr. Miller's testimony as lay opinion, Rapid Funding's argument places Mr. Miller's testimony into the category of expert opinion. "[K]nowledge derived from previous professional experience falls squarely within the scope of Rule 702 and thus by definition outside of Rule 701." *United States v. Smith*, 640 F.3d 358, 365 (D.C. Cir. 2011) (quotation omitted).

Third, Mr. Miller relied on a technical report by an outside expert. Rapid Funding hired the Anderson Group to estimate the replacement value of the North Building. At trial, Mr. Miller stated that his valuation relied on the conclusions of the Anderson Group report. The report runs 1,525 pages and uses specialized accounting calculations. Mr. Miller based his testimony not only on his own professional experience, he also relied on the extensive technical analysis and conclusions of a professional appraisal company. Such testimony should only be admitted under Rule 702, not Rule 701. *See also* Fed. R. Evid. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.").

Fourth, the Federal Rules of Evidence generally consider landowner testimony about land value to be expert opinion. The Rule 702 advisory committee's note states that landowners testifying to land value are "skilled witnesses" under Rule 702. *See* Fed. R. Evid. 702, advisory committee's note; *see also LaCombe v. A-T-O, Inc.,* 679 F.2d 431,

434 n.4 (5th Cir. 1982) ("Although both sides in this appeal have argued in terms of the general principles applicable to [Rule 701], the testimony of an owner as to the value of his property is admitted under the Federal Rules of Evidence under [Rule 702]"); *Turner v. Murphy Oil USA*, 759 F. Supp. 2d 854, 857-58 (E.D. La. 2011) ("[T]he owner of real property may testify as to the value of her property. . . . Such testimony is to be deemed admissible as expert testimony under Rule 702." (quotation omitted)).[1]

The district court's reference to the Rule 701 advisory committee's note about business owners testifying to the value of their businesses does not support the admissibility of Mr. Miller's valuation testimony. Mr. Miller was not testifying to the value of Rapid Funding's business or its projected profit. In *LifeWise*, we clarified that the note allowing business owners to testify about the value of their businesses does not

---

[1] *United States v. 10,031.98 Acres of Land*, 850 F.2d 634 (10th Cir. 1988), a condemnation case in which landowner testimony was at issue, did not mention Rule 701 and suggested, citing *LaCombe*, that such testimony could be admitted under Rule 702. *Id*. at 636 (also citing the advisory committee's note to Fed. R. Evid. 702). *10,031.98 Acres* was decided before *Daubert*, *Kumho*, and the 2000 amendments to Rule 702 established the reliability test for expert testimony. If expert testimony is not reliable under *Daubert*/*Kumho*, it is not admissible under Rule 702, and Rule 701(c) forbids its admission under Rule 701. In this case, the testimony was expert. The district court held it to be unreliable and inadmissible under Rule 702. It should not have been admitted as opinion evidence under Rule 701. Although *10,031.98 Acres*, *LaCombe*, and the Rule 702 advisory committee note point to landowner testimony on value as being expert in nature, with proper foundation, it may in the appropriate case be admitted as lay opinion under Rule 701. *See Cunningham v. Masterwear Corp.*, 569 F.3d 673, 676 (7th Cir. 2009) (landowner "can testify about [value] either as a matter within his personal knowledge . . . or, if he is an expert on property values, as an expert witness"). But where, as here, the testimony was expert opinion, it may not be admitted under Rule 701 by virtue of Rule 701(c).

allow for Rule 702 testimony to be admitted under Rule 701. 374 F.3d at 929. We noted that, when courts had allowed business owners to testify about business (as opposed to property) value, "the owners had sufficient personal knowledge of their respective businesses and of the factors on which they relied to estimate lost profits" or "the owners offered valuations based on straightforward, common sense calculations." *Id.* at 929-30.

The district court allowed Rapid Funding to do exactly what Rule 701(c) prevents: circumvent Rule 702 by offering expert testimony as lay opinion. As the advisory committee's note to the Rule 701 2000 amendments explains:

> Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing. Under the amendment, a witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

*See also Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 227-28 (3d Cir. 2008) ("[A] party simply may not use Rule 701 as an end-run around the reliability requirements of Rule 702 . . . . Preventing such attempts is the very purpose of subsection (c).").

Mr. Miller's testimony should not have been admitted under Rule 701. It was an abuse of discretion to do so. His testimony was based on technical or specialized knowledge, which is excluded from the category of lay opinion under Rule 701(c).

## 2. *Rapid Funding's Misplaced Reliance on Colorado Law*

Rapid Funding argues that Mr. Miller's testimony was properly admitted, but it does not rely, as the district court did, on Federal Rule of Evidence 701. Instead, Rapid

Funding contends that, because this is a diversity case, Mr. Miller's testimony was admissible under a Colorado common law rule that allows landowners to testify to the value of their property. *See In re Marriage of Plummer*, 709 P.2d 1388, 1389 (Colo. App. 1985) ("An owner may state his opinion of the value of his own property without being qualified as an expert witness.").

Rapid Funding's argument is unavailing because Mr. Miller's testimony was inadmissible regardless of whether we apply the federal or Colorado law. To show why this is so, we first explain how courts determine the applicability of a federal rule or state law in a diversity case following *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431 (2010). We then apply *Shady Grove*'s test and conclude that Federal Rule 701 and Colorado law do not conflict.

### a. *Determining the Applicable Rule of Evidence*

In a federal court diversity case, "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). *Erie* interpreted the Rules of Decision Act, which requires that "[t]he laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply." 28 U.S.C. § 1652. As the Supreme Court explained in *Hanna v. Plumer*, 380 U.S. 460, 465 (1965), "[t]he broad command of *Erie* was . . . federal courts are to apply state substantive law and federal procedural law."

*Hanna* presented a choice between Federal Rule of Civil Procedure 4(d) and a Massachusetts statute governing service of process. *Id.* at 461-62. The Court held *Erie* inapplicable to the Federal Rules of Civil Procedure. *Id.* at 470-71. Instead, the Court resolved the choice-of-law issue by construing the Rules Enabling Act, the federal statute under which the Rules were adopted. *Id.* at 464-66. Based on its reading of the Rules Enabling Act, the Court found that Federal Rule of Civil Procedure 4(d) applied. *Id.* at 473-74.

The Rules Enabling Act gives the Supreme Court "the power to prescribe general rules of practice and procedure and rules of evidence for cases in" federal courts, provided that "[s]uch rules shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072. Since *Hanna*, the language of the Rules Enabling Act has governed the choice between a rule adopted under the Act and state law.

The most recent case interpreting the Rules Enabling Act is *Shady Grove*. The plaintiffs filed a class action suit that was barred under a New York statute but permitted under Federal Rule of Civil Procedure 23. 130 S. Ct. at 1436-37. The question was whether the federal rule or state law applied. The Justices splintered three ways. Justice Scalia wrote for a four-justice plurality holding that Rule 23 applied. *Id.* at 1448. Justice Ginsburg wrote for the four dissenters. *Id.* at 1460. Justice Stevens concurred, and the Tenth Circuit has understood his concurrence to be the controlling opinion in *Shady Grove*. *See Garman v. Campbell Cnty. Sch. Dist. No. 1*, 630 F.3d 977, 983 n.6 (10th Cir. 2010) ("we look to Justice Stevens' concurrence for guidance on [whether a federal rule

-20-

or state law governs].").[2] Justice Stevens concurred in the judgment that Rule 23 applied but relied on narrower grounds than the plurality, agreeing with the dissent "that there are some state procedural rules that federal courts must apply in diversity cases because they function as a part of the State's definition of substantive rights and remedies." *Shady Grove*, 130 S. Ct. at 1448.

Justice Stevens explained that, in a diversity case, "when a situation is covered by a federal rule . . . . the Rules Enabling Act . . . controls." *Id.* at 1448. The Supreme Court promulgated Rule 23 under the Rules Enabling Act. *See id*. at 1437.

The Federal Rules of Evidence include provisions adopted by Congress and provisions adopted by the Supreme Court under the Rules Enabling Act. The different methods of adoption affect our choice-of-law analysis in the Tenth Circuit. The original Federal Rules of Evidence were enacted as an act of Congress in 1975. *See* Act of Jan. 2, 1975, Pub. L. No. 93-595, 88 Stat.1926. But part (c) of Rule 701, which excludes Mr. Miller's testimony, was added to Rule 701 in the 2000 Amendments to the Federal Rules of Evidence. The 2000 Amendments were not adopted as a statute, but were adopted under the Rules Enabling Act.

---

[2] *Garman* relied on *Marks v. United States*, 430 U.S. 188, 193 (1977), which stated that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *See also* Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 4509 (2d ed. 2011) (explaining that "federal courts have differed in their application of [*Shady Grove*]. . . . Some courts apply Justice Stevens's concurrence as the controlling opinion.").

We addressed how the original Federal Rules of Evidence apply in diversity cases in *Sims v. Great American Life Insurance Company*, 469 F.3d 870, 877 (10th Cir. 2006). We held that, because they were adopted by an Act of Congress, the original rules are not governed by *Erie*, the Rules of Decision Act, or the Rules Enabling Act. *Sims*, 469 F.3d at 883. Instead, the original rules are governed by *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988), which controls the application of federal statutes in diversity cases. *Sims*, 469 F.3d at 877. We declined to resolve how diversity courts should apply *amendments* to the Federal Rules of Evidence that were adopted under the Rules Enabling Act. *Sims*, 469 F.3d at 879 n.5 ("Again, we note that a number of the Federal Rules of Evidence have been amended since 1975. We do not address how these amendments affect the reach of either the Rules Enabling Act or the Rules of Decision Act.").

*Shady Grove*—the most recent Supreme Court case interpreting how to apply rules adopted under the Rules Enabling Act in a diversity case—governs the application of Rule 701(c) here. Justice Stevens offered a two-step framework for resolving an alleged conflict between an Enabling Act federal rule and state law.

First, the diversity court "determine[s] whether the scope of the federal rule is sufficiently broad to control the issue before the court, thereby leaving no room for the operation of seemingly conflicting state law." *Shady Grove*, 130 S. Ct. at 1451 (quotations omitted). "In some instances, the plain meaning of a federal rule will not come into direct collision with the state law, and both can operate." *Id.* (quotations

omitted).  In other words, the first step is to determine whether the federal rule and state law conflict.

Second, if applying the federal rule and state law results in a "direct collision, the court must decide whether application of the federal rule represents a valid exercise of the rulemaking authority . . . [under] the Rules Enabling Act."  *Id.* (quotations and citation omitted).  "That Act requires, *inter alia*, that federal rules 'not abridge, enlarge or modify *any* substantive right.'"  *Id.* (quoting the Rules Enabling Act, 28 U.S.C. § 2072(b)).

In this case we consider the relationship between Federal Rule of Evidence 701(c) and Colorado law.  We have concluded that Mr. Miller's testimony is inadmissible under Rule 701.  Rapid Funding contends the testimony is admissible under Colorado law.  We now apply Justice Stevens's framework to this case.

### b. *Federal Rule 701 and Colorado Rule 701 Do Not Conflict—Mr. Miller's Testimony Is Inadmissible Under Both*

If Mr. Miller's testimony were evaluated for admissibility under Colorado law as lay opinion, the starting point would be Colorado Rule of Evidence 701, which is identical to Federal Rule of Evidence 701.  *Compare* Colo. R. Evid. 701 *with* Fed. R. Evid. 701.  There is no "direct collision."  *See Shady Grove*, 130 S. Ct. at 1451.  Since 2002, Colorado Rule 701 has, like Federal Rule 701, included a part (c) that prohibits scientific, technical or specialized knowledge testimony from being admitted as lay opinion testimony.  *See* Colo. R. Evid. 701(c); *see also People v. Veren*, 140 P.3d 131, 136 (Colo. App. 2005) (explaining that "[t]he amendment to CRE 701 mirrors the

-23-

amendment adopted in 2000 to Fed. R. Evid. 701."). Because Mr. Miller's testimony is based on technical or specialized knowledge, his testimony is inadmissible under Colorado Rule 701(c).

Rapid Funding does not mention the Colorado Rules of Evidence. Instead, it relies on Colorado landowner rule case law. The committee comment to Colorado Rule 701 explains that "[t]his rule does not foreclose an owner from giving an opinion as to the value of his real property." Colo. R. Evid. 701 Committee Comment. This comment pre-dated the amendment that added part (c) to Rule 701. *See, e.g.,* Colo. R. Evid. 701 (1997) (including comment but not part (c)). It does not affect Rule 701(c)'s requirement that lay opinion testimony cannot be based on technical or specialized knowledge. *See Veren*, 140 P.3d at 137 ("As reflected in the text of the amendment to [Colo. R. Evid.] 701 and in the advisory committee's note to Fed. R. Evid. 701, the critical inquiry is whether a witness's testimony is based upon 'specialized knowledge.'").

The comment establishes that landowner valuation testimony, if not based on technical or specialized knowledge, may be admitted as lay opinion testimony. The Colorado Court of Appeals has explained that the amendments that added part (c) to Federal and Colorado Rule 701 do "not distinguish between expert and lay *witnesses*, but rather between expert and lay *testimony*." *Veren*, 140 P.3d at 136 (quoting Fed. R. Evid. 701 advisory committee's note). Mr. Miller did not give lay landowner valuation testimony. As we have shown, Mr. Miller's testimony was based on technical or specialized knowledge and therefore is not admissible under either Federal or Colorado

-24-

Rule 701.

Because Mr. Miller's testimony is inadmissible under both Federal Rule 701 and Colorado Rule 701, the two rules do not conflict. We do not need to reach step two of the *Shady Grove* analysis because there is no "direct collision" between the federal rule and state law. *See Shady Grove*, 130 S. Ct. at 1451. We hold that the district court's admission of Mr. Miller's testimony was erroneous and an abuse of discretion.

### 3. *Harmless Error*

We next address whether the district court's erroneous admission of Mr. Miller's testimony was harmless error. "An erroneous admission of evidence is harmless unless it had a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect." *Yeley-Davis*, 632 F.3d at 685 (quotation omitted).

The district court, in ruling on James River's post-trial motion, said that if it erred in admitting Mr. Miller's testimony, the error was harmless because the jury could have relied on Mr. Meyer's estimate that the value of the property under habitable conditions was more than $6.6 million. *See James River*, 2010 WL 965523 at *3. On appeal, Rapid Funding proposes three alternative bases for the jury's damages verdict: the Meyer estimate that the district court mentioned, Mr. Miller's $4.489 million pre-fire figure asserted in Rapid Funding's Proofs of Loss, and the Anderson Group's $7.145 million replacement cost estimate. None of the foregoing can adequately support the damages verdict, especially in light of the other evidence in the record.

### a. *Mr. Meyer's Testimony*

Both the district court in its post-trial order and Rapid Funding on appeal argue that the jury could have based its damages verdict on Mr. Meyer's testimony. *See James River*, 2010 WL 965523 at *3. To do so, the jury would have had to (1) accept Mr. Meyer's claim that the complex would be worth $6.6-7.0 million in habitable condition; and (2) disregard Mr. Meyer's habitability factor discount, which reduced the value of the property below zero. Rapid Funding suggests that the jury could have reached this conclusion because of Mr. Reilly's testimony casting doubt on the habitability factor.

Although it is conceivable for a jury to find part of a witness's testimony credible and other parts not credible, the steps of Mr. Meyer's analysis are not severable. Mr. Meyer specifically disavowed that the complex had a value of $6.6-7.0 million. His estimate applied only to the building after being restored to habitable condition, and no one claimed the building was habitable before the fire. Indeed, it was indisputably uninhabitable. That is why it had been condemned.

Even if the jury could have believed Mr. Reilly's criticism of the habitability factor, neither Mr. Reilly nor any other witness offered an alternative means to discount for the cost of restoring the buildings to habitability. A rational jury could not value the North Building based on a number associated with something that did not exist—a habitable building.

Rapid Funding also questions Mr. Meyer's expertise as an appraiser of residential real estate. But if Mr. Meyer is not qualified to appraise residential real estate, his $6.6-7.0 million figure is just as suspect as his habitability factor, and Rapid Funding cannot

successfully argue that the former but not the latter suffices to uphold the damages verdict.

### b. *Proofs of Loss*

Rapid Funding contends that the jury could have based its damages verdict on the Proofs of Loss that Rapid Funding submitted in its insurance claim. The claim contained the same $4.489 million number included in Mr. Miller's erroneously admitted valuation testimony.

James River responds that the Proofs of Loss were only admitted to prove that Rapid Funding had submitted a claim. Rapid Funding argues that James River, when it stipulated to the admission of the Proofs, should have sought a jury instruction limiting the evidence to establishing that Rapid Funding submitted a claim. James River points to the futility of asking for a limiting instruction on the Proofs of Loss when it had just lost a motion in limine to prevent Mr. Miller from testifying to the value asserted in the Proofs of Loss.

Regardless of whether James River should have sought a limiting instruction, a rational jury could not rely on the Proofs of Loss to establish damages.[3] The Proofs of Loss were allegations of what Rapid Funding believed it could prove the North Building was worth. Just as allegations in a complaint cannot establish the facts they assert, neither can allegations in a Proof of Loss. To uphold the damages verdict based on the

---

[3] The district court said the testimony was "relevant to [Mr. Miller's] explanation as to how [he] came up to the number for his claim." ROA, Vol. 5 at 1107.

Proofs of Loss would be to misunderstand what they represent.

As we have said, "[t]he purpose of . . . proof of loss clauses in primary insurance contracts is to afford the insurer an opportunity to form an intelligent estimate of its liabilities." *Sec. Mut. Cas. Co. v. Century Cas. Co.*, 531 F.2d 974, 978 (10th Cir. 1976); *see also State ex rel. Arnold v. Ommen*, 201 P.3d 1127, 1138 (Wyo. 2009) ("The purpose of a proof of loss is to enable an insurer to investigate a claim and determine its rights and liabilities."). That is all the Proofs of Loss were meant to do here: to provide James River with the opportunity to investigate the value of Rapid Funding's claim and then arrive at an accurate estimate of its value.

### c. *Anderson Group Estimate*

Mr. Miller's Proofs of Loss relied, in part, on a number in the report he commissioned from the Anderson Group. The Anderson Group estimated that it would cost $7.145 million to replace the North Building. Rapid Funding argues that the jury could have based its damages verdict at least in part on that estimate.

The Anderson Group, however, did not provide an estimate of the actual cash value of the North Building, just its replacement and demolition costs. James River did not refuse a claim for the replacement cost of the building; it refused Rapid Funding's claim for actual cash value. Mr. Miller's valuation testimony did not reliably convert the replacement cost figure into an actual cash value figure, and there was no evidence admitted that could have allowed the jury to make that conversion other than Mr. Miller's inadmissible valuation testimony. We also note that the Anderson Group report was not

-28-

admitted in evidence.

### d. *Other Evidence*

There is room for debate over the North Building's worth before the fire. Some evidence admitted at trial suggests that the value was less than $3 million, which further supports the conclusion that the error of admitting Mr. Miller's valuation of $4.489 million was not harmless.

Robert Rice and Robert Niebauer bought the Amsterdam Gardens complex—the land, the South Building, and the North Building—for $2.6 million. Rapid Funding purchased the complex at the sheriff's foreclosure sale for $1.8 million. When Rapid Funding put the complex up for sale, it received offers between $1 and $1.2 million. Rapid Funding contracted to sell the complex back to Mr. Rice for $1.8 million and to forgive his $650,000 debt to Rapid Funding.

These figures are evidence of the value of the *complex*, not the *North Building*. They include the value of the land. Mr. Genzink told Rapid Funding the land was worth an estimated $1.12 million. These figures also include the value of the South Building, which was worth approximately the same as the North Building. To derive an estimate for the value of the North Building from any of these figures for the whole complex, one would need to subtract $1.12-1.3 million to account for the value of the land and divide the difference by two to account for the South Building, a result significantly less than $3 million.

### 4. *Remand for a New Trial*

Without Mr. Miller's valuation testimony, the jury's damages verdict must be overturned. Because the remaining evidence did not lend itself to a reliable estimate of the pre-fire value of the North Building, the appropriate remedy is not to reduce the damages through remittitur, but to have a new trial so the parties can introduce reliable valuation evidence and a jury can reach an accurate damages verdict. Accordingly, we remand this case for a new trial limited to the issue of damages.

## C. *C.R.S. § 10-3-1116*

A recently enacted Colorado statute entitled in part "Remedies for unreasonable delay or denial of benefits" provides: "A first-party claimant . . . whose claim for payment of benefits has been unreasonably delayed or denied may bring an action in a district court to recover reasonable attorney fees and court costs and two times the covered benefit." C.R.S. § 10-3-1116(1). Rapid Funding argues that it is entitled to additional damages under this new statute.

Resolution of this issue hinges on the timeline of events. Rapid Funding submitted its Proofs of Loss for its claim in March and May 2007. James River denied the claim on May 30, 2007. C.R.S. § 10-3-1116 went into effect on August 5, 2008. Therefore, to prevail on its argument for new damages, Rapid Funding must prove that the Colorado legislature meant C.R.S. § 10-3-1116 to apply retroactively or that James River engaged in a new act of bad faith after August 5, 2008.

In a pre-trial motion, Rapid Funding argued both that the statute applied retroactively and that James River had engaged in acts of bad faith after August 5, 2008

when it failed to reverse its position after learning new information during discovery. The district court rejected both arguments and dismissed Rapid Funding's claim under C.R.S. § 10-3-1116. *See James River*, 2009 WL 524994 at *9.

On retroactivity, the court noted that both Colorado law and federal law presume that statutes do not apply retroactively absent specific legislative intent. *See id*. at *7 (citing *City of Colo. Springs v. Powell*, 156 P.3d 461, 464 (Colo. 2007); *United States v. Husted*, 545 F.3d 1240, 1246 (10th Cir. 2008)). The court said that, because the new statute "lacks any explicit indication from the Colorado legislature that its provisions should apply retroactively," the presumption stands, and the statute does not apply retroactively. *Id.* at *8.

On post-August 5, 2008 acts of bad faith, the court said that if it "held that each new fact brought out during discovery created the basis for a new and separate breach of a [good faith and fair dealing] claim, a pleading and docketing quagmire would ensue as the parties constantly amended their pleadings in response to new depositions and discovery responses." *Id.* at *9.

Rapid Funding raised this issue again in a post-trial motion, adding that James River's claims agent Ms. Marson had testified that James River continued to review new information about the claim up through trial. The court rejected this argument: "There is no principled distinction between the 'information unearthed in discovery' and the testimony of Ms. Marson that she continued to review new information up through trial; the risk of permitting a separate bad faith claim each time a new fact is considered is

-31-

equally prevalent in both circumstances." *James River*, 2010 WL 965523 at *5. The court therefore dismissed the motion for new damages. *Id.* at *10.

Rapid Funding appeals that ruling. It does not appeal the district court's holding that the statute does not apply retroactively. Rapid Funding argues instead that James River's failure to pay out the claim after August 5, 2008 constituted an unreasonable delay. According to Rapid Funding, James River owed it a continuing duty to evaluate the loss as new information became available, and that duty continued through trial. Therefore, Rapid Funding, relying again on Ms. Marson's testimony, argues that James River had no reasonable basis to refuse to pay out after it allegedly discovered during the litigation that it owed Rapid Funding something for the actual cash value.

James River argues that it never delayed paying Rapid Funding's claim; it denied the claim. Treating its denial as a "delay" would read "denial" out of the language of the statute.

"To properly discern the content of state law, we must defer to the most recent decisions of the state's highest court." *Kokins*, 621 F.3d at 1295 (quotation omitted). There is no Colorado case law interpreting this aspect of the new statute. In the general context of Colorado insurance law, the Colorado Supreme Court has said that "it is the affirmative act of the insurer in unreasonably refusing to pay a claim and failing to act in good faith, and not the condition of nonpayment, that forms the basis for liability in tort." *Farmers Grp., Inc. v. Trimble*, 691 P.2d 1138, 1142 (Colo. 1984).

In this case, the jury determined that James River unreasonably refused payment

on May 30, 2007.  No unreasonable refusal occurred after C.R.S. § 10-3-1116 went into effect on August 5, 2008.  We agree with James River, consistent with *Trimble*, that its refusal to pay Rapid Funding for the North Building was a discrete denial rather than a continuing delay.  To hold otherwise would effectively require insurance company defendants in James River's position to front any payment they dispute with their insureds before trial or face the prospect of additional damages beyond what they owe for their alleged unreasonable refusal.

Rapid Funding is entitled to whatever damages it might win on remand, but not under C.R.S. § 10-3-1116.

## IV. CONCLUSION

The Federal Rules of Evidence applied to the admissibility of Mr. Miller's valuation testimony.  Because that testimony was based on technical or specialized knowledge, it was erroneously admitted under Federal Rule 701.  The remaining evidence cannot support the jury's damages verdict.  The error in admitting Mr. Miller's valuation testimony was reversible and not harmless.  The damages verdict is REVERSED and the case is REMANDED for a new trial to determine damages.

We also AFFIRM the district court's dismissal of Rapid Funding's claim under C.R.S. § 10-3-1116.  We DENY Rapid Funding's "Motion to Strike Attachment to and Arguments in Appellant's Reply Brief."