**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 29, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ANGIE DERRICK; RONNY DERRICK,
a married couple,

      Plaintiffs Counter Defendants -
      Appellants,

v.

STANDARD NUTRITION COMPANY,
a Nebraska corporation, d/b/a A-C
Nutrition LP, a Texas limited partnership,

      Defendant Counterclaimant -
      Appellee.

No. 19-2120
(D.C. No. 2:17-CV-01245-RB-SMW)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **BALDOCK**, and **McHUGH**, Circuit Judges.
_____

Angie Derrick and Ronny Derrick ("Derricks") appeal the district court's order

for summary judgment in favor of Standard Nutrition Company ("Standard

Nutrition") on their claims for death and injury to their horses as a result of eating

feed that allegedly contained toxic concentrations of monensin—an antibiotic

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

sometimes used in cattle feed.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  BACKGROUND

On December 14, 2016, shortly after the Derricks began feeding the alleged contaminated feed to their horses, they discovered two of their horses had died.  The Derricks called veterinarian Dr. Ronald Box, who came to their ranch the same day.  After Dr. Box ruled out snakebites or poisonous plants as the cause of death, he took a sample of feed from the Derricks' feed bin and tissue samples from the hearts and organs of the dead horses and sent them to an independent laboratory for analysis.[1]

On December 21, the laboratory determined that the horses had been dead too long to yield any meaningful analysis from the tissue samples; however, it did discover trace amounts of monensin in the feed sample at a level of 1.2 parts per million.  The laboratory's veterinary toxicologist who tested the feed sample reported that "[a]t a concentration of 1.2 [parts per million] in the feed, a 1000 lb. horse . . . would have to consume more than its body weight in feed to get a lethal dose of monensin."  Aplt. App., Vol I at 255.

Dr. Box told the Derricks that there would "have [to] be fresh deaths in order to learn any more than was learned from the first two, as autolysis destroyed the

---

[1] Kevin Floyd, who sold the feed to the Derricks, also took samples from the Derricks' feed bin (top, middle, and bottom) and sent them to the same independent laboratory who tested Dr. Box's sample.  The laboratory reported no detectable monensin in any of Mr. Floyd's samples.

tissues quickly making lab analysis impossible." *Id*. at 227. Dr. Box also provided the Derricks a handwritten letter in which he explained his actions and observations.

> On 12-14-16 I posted [two] horses belonging to [the Derricks]. They were fed [two] days earlier and appeared fine. They were not seen for [two] days and probably died [one] day after being fed. On autopsy all I can truthfully say is there was no colic. The [two] horses were found near each other and did not appear to struggle. They were undergoing severe autolysis.
>
> I sent in heart [and] liver [tissue samples] from both horses. [The laboratory] was unable to do histopath[ology] because of the severe autolysis. I sent in stomach contents from both horses—neg[ative] for mone[n]sin. I caught a little screening of feed coming out of the overhead bulk tank. It was positive for mone[n]sin at 1.2 [parts per million].
>
> With the severe autolysis I cannot prove with the liver or heart that these horses died of mone[n]sin. The lab informed me that not finding mone[n]sin in the stomach contents could be because the drug had already cleared the stomach.
>
> I found mone[n]sin in the feed. Even though it is at a very low level I cannot testify [to] the concentration of the mone[n]sin of the feed that these horses ate.
>
> In my professional opinion[,] these horses died of mone[n]sin toxicity.

*Id*. at 257.

After receiving Dr. Box's letter, the Derricks informed Standard Nutrition that they would seek compensation for the dead horses. In December 2017, a month after the Derricks filed suit, there were two "fresh deaths"; however, the Derricks did not enlist Dr. Box or anyone else to harvest tissue samples for testing.

## II. DISTRICT COURT PROCEEDINGS

The Derricks filed suit in New Mexico state court in November 2017, in which they asserted claims for: (1) negligence; (2) negligence per se; (3) strict products liability; (4) unfair trade practices; (5) fraud; (6) negligent misrepresentation;

3

(7) cruelty to animals; (8) breach of contract; (9) negligent infliction of emotional distress; and (10) breach of implied warranty of merchantability. Standard Nutrition removed the suit to federal court.

During discovery, Standard Nutrition timely disclosed Dr. Jeffrey Hall, an animal toxicology specialist, as an expert witness. Dr. Hall opined that for the first two horses to have died from monensin toxicity in the timeframe outlined by Dr. Box, they would have needed to consume feed with a monensin concentration of approximately 700 parts per million. Dr. Hall further opined that there were numerous possibilities for what killed the horses; however, he definitively ruled out the possibility of monensin toxicity based on the independent laboratory's analysis, which showed a maximum of 1.2 parts per million of monensin in the feed samples— a nontoxic concentration.

For their part, the Derricks built their case around a theory that the alleged contaminated feed contained "hot spots," i.e., "powdery monensin often is not distributed evenly in the feed, including the fines, and . . . damaging or lethal 'hot spots' are common." Aplt. Opening Br. at 6. Despite the fact that the Derricks never took any additional samples of the feed from their own feed bin before feeding it to their cattle, they asked for sanctions against Standard Nutrition on the grounds that it reused or disposed of (spoliated) 1180 pounds of fines from the Derricks' feed, which in turn prevented testing the fines for "hot spots." They also sought sanctions for Standard Nutrition's alleged failure to disclose records concerning its inventory of

4

monensin.  On April 12, 2019, the magistrate judge issued a memorandum opinion and order denying the motion for sanctions.

On May 8, the district court issued a memorandum opinion and order on summary judgment in which it determined that Dr. Box's testimony would be limited to his observations and actions on the day he examined the two dead horses in December 2016.  The ruling meant that the Derricks could not prove the element of causation required for their claims of negligence, negligence per se, strict products liability, breach of contract, and breach of implied warranty of merchantability claims, and the court entered summary judgment for Standard Nutrition on those claims.  The court, however, found disputed issues of material fact on the claims for fraud, negligent misrepresentation, and unfair trade practices and denied summary judgment.[2]

On June 6, the Derricks filed a motion for reconsideration, which the district court denied.  The Derricks then voluntarily dismissed their claims for unfair trade practices, fraud, and negligent misrepresentation and stipulated to the remand of Standard Nutrition's counterclaims for breach of contract (failure to pay for the feed) and malicious abuse of process to state court.  This appeal followed.

---

[2] The district court also granted summary judgment for Standard Nutrition on the Derricks' claims for cruelty to animals and negligent infliction of emotional distress.  The Derricks assign no error to the court's disposition of these claims.

## III.  DISCUSSION

### A.  Summary Judgment

#### 1.  Background

The parties agree that under New Mexico law, which applies in this diversity case, the Derricks cannot prove their claims for negligence, negligence per se, strict products liability, breach of contract, or breach of implied warranty of merchantability without evidence of causation.  As such, unless the district court erred in limiting the scope of Dr. Box's testimony, summary judgment was proper.

Before ruling on summary judgment, the district court ordered the parties to explain their respective positions on the proper scope of Dr. Box's testimony.  The Derricks argued that Dr. Box was timely disclosed as an expert witness and could therefore offer his opinion that the horses died from monensin toxicity.  The court rejected this argument, noting the magistrate judge's ruling that the Derricks failed to properly disclose Dr. Box as an expert witness.

The district court then considered the proper scope of Dr. Box's testimony as a lay witness.  In this regard, the court considered Fed. R. Evid. 701, which provides that a lay witness may only testify to opinions that are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; *and (c) not based on scientific, technical, or other specialized knowledge.*"  *Id*. (emphasis added).  As the court explained, because "[a] diagnosis of monensin poisoning is . . . complex . . . [and] outside the realm of

6

common experience," Aplt. App., Vol. II at 374, "Dr. Box may not offer an opinion on causation or diagnosis," *id*. at 366.

Nonetheless, the court determined that Dr. Box, as a lay witness could testify

> about his observations from the day he actually saw the horses, but he may not provide testimony beyond what he perceived or did. In other words, Dr. Box may not testify about monensin—what it is, its effect on horses, whether feed for horses may [properly] contain monensin, et cetera. [And] [i]f he testifies at trial, Dr. Box may . . . read the results of the lab reports [the Derricks] received as a result of the samples he took in December 2016. Beyond reading those results, Dr. Box may not testify further about monensin or speculate about the meaning of the lab results.

*Id*. at 364 (brackets, citation, and internal quotation marks omitted).

## 2. **Standard of Review**

"We review a district court's determination regarding the admissibility of evidence under an abuse of discretion standard." *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1212 (10th Cir. 2011) (internal quotation marks omitted). "A district court abuses its discretion when its decision is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Marquez*, 898 F.3d 1036, 1049 (10th Cir. 2018) (brackets and internal quotation marks omitted).

## 3. **Analysis**

"[Fed. R. Evid.] 701 *does not* permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness." *James River*, 658 F.3d at 1214 (emphasis added) (internal quotation marks omitted). Stated otherwise, "Rule 701

7

allows lay witnesses to offer observations *that are common enough and require a limited amount of expertise, if any*." *Id.* (emphasis added) (brackets, ellipsis, and internal quotation marks omitted).

The Derricks cite no authority for the proposition that a diagnosis of monensin poisoning does not require specialized knowledge. Therefore, the court did not abuse its discretion regarding the scope of Dr. Box's testimony.

## B. Motion to Reconsider

### 1. The New Evidence and Dr. Box's Testimony

#### a. *Background*

In their motion for reconsideration filed in June 2019, the Derricks produced for the first time an April 8, 2019 histopathology report from the necropsy of a horse they euthanized on March 29, in which the examiner found a lesion in the heart tissue that "has been associated with ionophores, particularly monensin." Aplt. App., Vol. II at 400 (internal quotation marks and emphasis omitted). Based on this "new" evidence, the Derricks urged the court to reverse its summary judgment order and permit Dr. Box to read the report to the jury at the trial set to begin in July. Separately, they asked the court to reconsider its order relating to the scope of Dr. Box's testimony.[3]

---

[3] The district court acknowledged its authority under Fed. R. Civ. P. 54(b) to review the order prior to entry of a final judgment and looked to Fed. R. Civ. P. 59(e) for the standard of review. Under Rule 59(e), the court may amend or correct a judgment on the grounds of "(1) an intervening change in the controlling law, (2) [when] new evidence previously [was] unavailable, and (3) the need to correct

Regarding the untimely disclosure, the Derricks argued, and the district court agreed, that the factors in *Woodworker's Supply, Inc. v. Principal Mutual Life Insurance Co.*, 170 F.3d 985, 993 (10th Cir. 1999), should guide the court's decision. In *Woodworker's*, this court held that the court should consider four factors in the exercise of its "broad discretion" to determine whether the failure to timely disclose the evidence is "justified or harmless." *Id.* (internal quotation marks omitted). The four factors to be considered are: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Id.*

In exercising its broad discretion, the district court reviewed the four factors and determined the late disclosure was neither justified nor harmless. First, in its thorough and comprehensive order, the court outlined in detail the prejudice to Standard Nutrition and found that the first factor "heavily leans in favor of excluding both Dr. Box's expert testimony and the new evidence." Aplt. App., Vol. II at 441. Second, the court explained that "there is now little time to cure the prejudice . . . as trial is set for next month." *Id.* Next, because the trial was imminent, the court determined that the admission of the new evidence would "significantly disrupt the trial." *Id.* at 442. Last, while the court said it "hesitates to find that [the Derricks] acted in bad faith . . . the Court cannot find that [they] acted in *good* faith." *Id.* In

clear error or prevent manifest injustice." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

9

this regard, the court cited the Derricks' "decision[] to wait until months after the discovery deadline to obtain [the report], [their] fail[ure] to submit the new evidence to the Court for approximately two months after obtaining it and only after the Court ruled on dispositive motions, and [their] continuous[] disregard [of] deadlines, the scheduling order, and the Local Rules." *Id*. at 442-43.

The district court further declined to reconsider its order regarding the scope of Dr. Box's testimony. In this regard, the Derricks argued that the court mistakenly relied on medical malpractice cases and cited for the first time two products liability cases they maintained dictated a different outcome. The court squarely rejected their argument for two reasons. First, the court noted that "[a] motion to reconsider is not a second chance for the losing party to make its strongest case or to dress up arguments that previously failed." *Id.* at 445 (internal quotation marks omitted). Second, the new authorities did not change the outcome. In particular, the court explained that in *any* type of case, a lay witness cannot offer opinion testimony on a topic such as monensin poisoning, which requires the special skill and knowledge of an expert witness. *See James River*, 658 F.3d at 1214.

### b. *Standard of Review*

"We review [the] district court's decision denying [an interlocutory] motion for reconsideration for abuse of discretion." *Spring Creek Expl. & Prod. Co. v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1024 (10th Cir. 2018). "Under an abuse of discretion standard, a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of

10

judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* (internal quotation marks omitted). "That is to say, we will not alter a trial court's decision unless it can be shown that the court's decision was an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Id.* (internal quotation marks omitted).

### c. *Analysis*

On appeal, the Derricks repeat the same arguments they made in the district court and argue for a different outcome. In other words, they ignore that the standard of review on appeal is for abuse of discretion, i.e.. whether the decision was arbitrary, capricious, whimsical, or manifestly unreasonable. Nonetheless, we have carefully examined the court's thorough and comprehensive order, which is firmly anchored to the law and facts, and find no abuse of discretion.

### 2. Sanctions

In their motion for reconsideration, filed nearly two months after the magistrate judge issued a memorandum opinion and order denying their motion for sanctions, the Derricks asked the district court to "reconsider" the order. Relevant here, the court denied the motion as untimely under Fed. R. Civ. P. 72(a), which provides that a party who opposes a magistrate judge's non-dispositive order may file objections with the district court within 14 days of service of the order; otherwise, absent timely objections, "[a] party may not assign as error a defect in the order." *Id.* Despite the fact that the Derricks failed to file timely objections they argue that "the

Magistrate Court was mistaken in denying sanctions for spoliation." Aplt. Opening Br. at 34.

This court has "adopted a firm waiver rule that provides that the failure to make timely objections to the magistrate[] [judge's] findings or recommendations waives appellate review of both factual and legal questions." *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1059 (10th Cir. 1996) (internal quotation marks omitted); *see also Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th Cir. 1997) ("Properly filed objections resolved by the district court are a prerequisite to our review of a magistrate judge's order [regarding non-dispositive matters].").

We have recognized two exceptions to the firm waiver rule. We do not apply the rule "when (1) a *pro se* litigant has not been informed of the time period for objecting and the consequences of failing to object, or when (2) the interests of justice require review." *Morales-Fernandez v. INS*, 418 F.3d 1116, 1119 (10th Cir. 2005) (internal quotation marks omitted). The first exception does not apply because the Derricks were represented by counsel in the district court. *See Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016) (holding the first exception was inapplicable because the appellant was represented by counsel).

And the second exception does not apply either. The interests-of-justice exception applies to a counseled party "only in the rare circumstance in which a represented party did not receive a copy of the magistrate[] [judge's decision.]" *Vega v. Suthers*, 195 F.3d 573, 580 (10th Cir. 1999).

12

## III. CONCLUSION

The judgment of the district court is affirmed.


Entered for the Court


Carolyn B. McHugh
Circuit Judge