FILED
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**November 30, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

LAMBLAND, INC., d/b/a A-1 Organics,
Inc., a Colorado corporation,

    Plaintiff - Appellee,

v.

HEARTLAND BIOGAS, LLC, a Denver
limited liability company,

    Defendant - Appellant.

No. 22-1184
(D.C. No. 1:18-CV-01060-RM-KLM)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **McHUGH**, and **CARSON**, Circuit Judges.
_____

At its most basic level, this case involves a breach of contract and the resulting

damages. But to determine whether a breach occurred and whether the jury's award

of damages was correct, we must address—among other things—a now-changed

Colorado Department of Public Health and Environment Rule, conflicting

consequential damages provisions, and alleged expert testimony never reviewed

under Federal Rule of Evidence 702.

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Before the district court, the party alleging breach and seeking damages won. Now, exercising jurisdiction under 28 U.S.C. § 1291, we affirm all but the district court's entry of the jury's damages verdict.  On that issue, we vacate and remand.

I.

In 2010, Heartland Renewable Energy, LLC ("HRE") planned to develop a solid waste facility on land in Weld County, Colorado ("Facility").  HRE planned to use an anaerobic digester to convert cow manure, food waste, and other organic waste into renewable natural gas.[1]  But to operate the Facility, HRE had to first obtain a Use by Special Review Permit ("USR") and a Certificate of Designation ("CD") from the Weld County Board of County Commissioners ("BOCC").  HRE submitted its application and BOCC issued a USR and CD to HRE, permitting it to develop the property and operate the Facility.

In 2013, EDF Renewable Development, Inc. ("EDF")—Defendant Heartland Biogas, LLC's ("Heartland") parent corporation—purchased the Facility from HRE. [Id.]  HRE assigned its assets to Heartland, including the BOCC's "USR and Resolutions."  According to Heartland, both BOCC and the Colorado Department of Public Health and Environment ("CDPHE") approved the transfer.  Heartland also provided financial assurance to CDPHE and BOCC.

---

[1] "Anaerobic digestion is a process through which bacteria break down organic matter—such as animal manure, wastewater biosolids, and food wastes—in the absence of oxygen."  Env't Prot. Agency, How Does Anaerobic Digestion Work?, https://www.epa.gov/agstar/how-does-anaerobic-digestion-work.

The Facility also intended to distribute and sell a liquid soil amendment—a liquid digestate produced by the Facility's anaerobic digestion process. The Colorado Department of Agriculture approved the liquid soil amendment for sale. Heartland invested over $100 million in the Facility. Heartland began partial operations in April 2014.

Before assigning its assets to Heartland, HRE contracted with Plaintiff Lambland, Inc., doing business as A-1 Organics, Inc. ("A-1") to supply it with substrate, or waste, to be turned into biogas and other products. A-1 agreed to build a digester processing system, which would process the substrate into material that could feed the Facility's digesters. That, in turn, would produce renewable natural gas. Heartland assumed HRE's contract with A-1. A-1 did not build the digester processing system, but Heartland agreed to build it and lease it back to A-1.

In August 2015, Heartland and A-1 entered into an Industrial Operating Lease ("Lease") and an Amended and Restated Substrate Services Agreement ("SSA"). Each agreement was for a twenty-year term. A-1 expected to receive two streams of income over the twenty-year period. First, it would receive operating income from "tipping fees" paid by substrate suppliers when they "tipped" truckloads of substrates at the digester processing system. Second, Heartland agreed to pay A-1 a 12.5% marketing fee on sales of digested solids—a byproduct of the anerobic digestion process. A-1 entered five-year, third-party contracts to satisfy its obligation to provide substrates. In November 2015, A-1 began supplying the substrate and Heartland commenced full operations.

3

But one year later, Heartland began facing regulatory issues. In November 2016, a Colorado state attorney advised the Assistant Weld County Attorney that Heartland did not have a CD and that it was operating in violation of Colo. Rev. Stat. § 30-20-102(1). In December 2016, upon their own inspections, the Weld County Department of Public Health and Environment ("WCDPHE") and BOCC decided that Heartland had failed to obtain the permitting necessary to operate the Facility because it did not have a CD. Later that month, BOCC held a final show-cause hearing to determine whether to revoke Heartland's USR. It suspended the Facility's USR "until the [F]acility gets a valid Certificate of Designation and comes in compliance with the development standards and the Use by Special Review Permit."

Shortly thereafter, Heartland shut the Facility and sued the State of Colorado and BOCC for an injunction and damages. In late January 2017, Heartland stopped accepting substrate from A-1, notifying A-1 that it needed to divert substrate from the digester processing system. A-1 diverted the substrate to another facility, and Heartland paid A-1 over $600,000 in diversion costs for 12 months of diversion. In February 2017, Heartland notified A-1 that it was suspending the SSA because of a force majeure event—suspension of the USR. One month later, A-1 contended that Heartland defaulted under both the lease and the SSA and that, as a result, A-1 was terminating the agreements. Heartland rejected A-1's notice of termination and advised A-1 that its substrate needs for the coming 12 months would be zero.

4

In May 2018, A-1 sued Heartland for breach of contract.[2]  In January 2020, A-1 moved for partial summary judgment on its breach of contract claim.  A-1 asserted that no genuine issues of material fact existed on Heartland's liability for breach because A-1 substantially performed its obligations under the lease and substrate services agreements, Heartland failed to perform because it did not obtain a CD, and A-1 suffered some amount of damages as a result.  The district court agreed and granted A-1's motion for partial summary judgment.  The district court said that Heartland did not follow the application procedure set forth by statute to obtain a CD and that it was not persuaded that Heartland obtained a valid CD from HRE by other means.

After the district court's ruling on summary judgment, only one issue remained for a jury: the amount of damages A-1 suffered.  A-1 filed a motion in limine to prevent Heartland from introducing any causation evidence at trial.  The district court granted the motion, stating that it had determined in its summary judgment ruling that Heartland's breach of the agreements caused an unspecified amount of damages to A-1.  But the district court allowed Heartland to make a written offer of proof setting forth the causation evidence it would have presented at trial.

Heartland also filed motions in limine.  Pertinent here, Heartland sought to prevent A-1 from introducing evidence at trial on consequential damages, including lost profits.  Heartland contended that the agreements barred A-1 from recovering

_____

[2] A-1 also sued Heartland and EDF for negligent misrepresentation, but the parties filed a stipulated motion to dismiss A-1's tort claims before trial.

those damages.  The district court disagreed with Heartland.  Heartland also sought to prevent A-1 from presenting expert opinions on lost profits, including tipping and marketing fees, because A-1's retained damages expert had offered no opinions about lost profits.  A-1 disagreed.  It argued that its expert should be allowed to testify about lost profits and that its CFO, Travis Bahnsen, should be allowed to testify about lost profits as a lay witness.  The district court agreed with Heartland as to the expert witness and with A-1 on its CFO.

The parties proceeded to trial on damages.  The jury awarded A-1 $6,037,553.89 in damages, including past lost net operating income of $592,487, future lost net operating income of $1,836,544.06, past lost net marketing fees of $1,226,400, and future lost net marketing fees of $1,513,744.83.  The jury also awarded net diversion damages of $868,378.  Heartland filed a renewed motion for judgment as a matter of law or, alternatively, a motion for a new trial, which the district court denied.  The district court entered judgment in the amount of $9,001,873.52, which included $717,452 in prejudgment interest, $1,894,090.95 in attorney fees, and $352,776.68 in costs.

## II.

"We review the district court's grant of summary judgment de novo." Obermeyer Hydro Accessories, Inc. v. CSI Calendering, Inc., 852 F.3d 1008, 1014 (10th Cir. 2017) (quoting Higby Crane Serv., LLC v. Nat'l Helium, LLC, 751 F.3d 1157, 1160 (10th Cir. 2014)).  Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). "We view the evidence, and draw all reasonable inferences therefrom, in the light most favorable to the nonmoving party." Obermeyer Hydro Accessories, 852 F.3d at 1014 (citing Higby Crane Serv., 751 F.3d at 1160). Because the parties agree that Colorado law governs their agreements, we apply Colorado law. See id. at 1015 (citing Carolina Cas. Ins. Co. v. Nanodetex Corp., 733 F.3d 1018, 1022 (10th Cir. 2013)).

And we review the district court's denial of judgment as a matter of law de novo, using the same standard as the district court. O'Neal v. Ferguson Const. Co., 237 F.3d 1248, 1252 (10th Cir. 2001) (citing Greene v. Safeway Stores, Inc., 98 F.3d 554, 557 (10th Cir. 1996)). Judgment as a matter of law is appropriate "only where the evidence and all inferences to be drawn therefrom are so clear that reasonable minds could not differ on the conclusion." Motive Parts Warehouse v. Facet Enters., 774 F.2d 380, 385 (10th Cir.1985).

Finally, we review evidentiary rulings for abuse of discretion. See, e.g., Sundance Energy Okla., LLC v. Dan D. Drilling Corp., 836 F.3d 1271, 1279 (10th Cir. 2016); Leprino Foods Co. v. Factory Mut. Ins. Co., 453 F.3d 1281, 1287 (10th Cir. 2006).

III.

Heartland raises four issues on appeal. Heartland first contends the district court erred in granting summary judgment on liability. Second, Heartland argues that the district court erred on causation—either by granting summary judgment or by excluding evidence on that ground. And its third and fourth issues relate to damages.

7

Specifically, whether the district court erred by determining A-1 could recover consequential damages or by allowing the jury to award lost profits. We address each in turn.

A.

To recover on its breach of contract claim, A-1 needed to prove (1) the existence of a contract, (2) its own performance, (3) Heartland's failure to perform, and (4) resulting damages. W. Distrib. Co. v. Diodosio, 841 P.2d 1053, 1058 (Colo. 1992).

The parties agree on the first two elements: they had two agreements—the Lease and the SSA—and A-1 performed. But the parties do not agree on the final two elements: Heartland's failure to perform and resulting damages.

Before addressing Heartland's first argument, we cover some additional background. A-1's position—with which the district court agreed—is that Heartland failed to perform provisions of the Lease and SSA that, in effect, required Heartland to comply with the law. In the Lease, the relevant provision reads:

> The performance and compliance by [Heartland] with all the terms, provisions and conditions of this Lease will not and do not conflict with or result in any violation of any of the terms, conditions or provisions of any agreement, obligation, judgment, decree, order, ordinance, statute, rule or regulation applicable to [Heartland] or to the [Facility].

Appellant's App. Vol. XII at 65. And in the SSA, the relevant provision reads:

> Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will . . . violate any Law or any judgment, decree, or order of any court or other governmental body, applicable to Heartland.

8

Appellant's App. Vol. XII at 125.

According to A-1, because Heartland did not obtain a CD as required by Colorado law applicable to solid waste disposal sites and facilities, Heartland violated the law and thus breached the agreements.

A-1 is right that Colorado law requires entities like Heartland to have a CD. Under Colo. Rev. Stat. § 30-20-102(1), "a person who owns or operates a solid wastes disposal site and facility shall first obtain a certificate of designation from the governing body having jurisdiction over the area in which such site and facility is located." The process for obtaining a CD is outlined in § 30-20-103.

Heartland does not suggest that it complied with the full statutory process for obtaining a CD. Rather, Heartland says that it obtained a CD in accordance with a CDPHE Rule that permitted CD transfers under certain circumstances. That Rule, 6 C.C.R. 1007-2 § 1.8.4(D) (2013) ("Rule 1.8.4(D)"), provided:[3]

> A certificate of designation may not be transferred to a new owner or operator unless, as part of the process, the assignment or transfer of the financial instrument(s) or alternate financial assurance has been reviewed and approved by the Department and the governing body having jurisdiction.

Heartland points to various evidence that it provided financial assurance to CDPHE and the BOCC. It argues that this evidence—combined with certain correspondence and testimony from CDPHE and BOCC suggesting review and

---

[3] After the dispute at-issue, in 2018, Rule 1.8 moved to Rule 4 and the language from Rule 1.8.4 changed "certificate of designation" to "financial assurance instrument."

9

approval of the financial assurance—raised a genuine issue of material fact as to whether the CD transferred.  We need not venture beyond the plain language of the statutes and rules before us to know that Heartland is wrong.

Rule 1.8.4(D) does not purport to outline the universe of requirements for transferring a CD.  Rather, read in context, Rule 1.8.4(D) is part of a subsection of rules on "Financial Assurance Criteria" and, by its terms, Rule 1.8.4(D) speaks only to "part of the process" of transfer to a new owner or operator.

The only Colorado law we have to this point states that "normally, a certificate to operate a particular site and facility is personal and nontransfer[]able without prior approval."  City of Denver v. Eggert, 647 P.2d 216, 226 (Colo. 1982).  After all, a license has "none of the elements of a contract," nor does it confer "an absolute right but a personal privilege to be exercised under existing restrictions and such as may thereafter be reasonably imposed."  Id. (quoting Mountain Med., Inc. v. City of Colo. Springs, 608 P.2d 821, 823 (Colo. App. 1980)).

Thus, at minimum, Heartland should have obtained approval from the agency authorized to issue CDs: the BOCC.  In its briefing, Heartland says this happened.  Indeed, according to Heartland, "[o]n January 6, 2014, BOCC formally approved the plat in Heartland's name, constituting final approval of USR-1704 and the CD."  Appellant's Br. at 25.  But Heartland's record citations do not state CD approval as fact.  The citations are to the USR permit and two pages of a statement of facts that

Heartland itself wrote in a conclusory fashion.[4]  To accept Heartland's statement that BOCC's formal approval of the plat constituted final approval of the CD requires us to rely on no more than Heartland's unsworn conclusion.  And Heartland's conclusory statement—unsubstantiated by any supporting facts or law—cannot create a genuine issue of material fact.

At different points Heartland argues that the USR included the CD, so by obtaining approval of USR-1704 in Heartland's name, the CD transferred too.[5]  But this argument is not tethered to statute, rule, or BOCC resolution.   In fact, this argument contradicts the statutory requirements for CDs.  See Colo. Rev. Stat. § 30-20-102(1).  The only support we can see for this argument comes from Heartland's belief based on conversations with an outside consultant, AGPROfessionals LLC ("AGPRO").  To be clear, neither Heartland's nor AGPRO's view of whether the CD transferred have any bearing on the issue of whether the CD transferred.

What's more, Heartland did not dispute to the relevant state or county entities that it actually had a CD.  That is, when WCDPHE and BOCC decided that Heartland

---

[4] Contrary to Heartland's statement that this "fact" went undisputed, the record shows that A-1 argued this statement was immaterial, irrelevant, and not a factual assertion.

[5] The USR and the CD are two separate permits with two distinct purposes: the USR is a land-use permit issued by the County, and the CD is a hybrid permit which serves both local zoning and statewide solid-waste processing purposes.  Under Colo. Rev. Stat. § 30-20-103, the CD cannot be issued without the State's express approval.  And, although the CD granted to HRE was included in the 2010 Resolution with the USR-1704 approving a special use of the land, the CD required a separate technical review from the CDPHE.

had failed to obtain the permitting necessary to operate the Facility because it did not have a CD (and the BOCC ultimately suspended the Facility's USR), Heartland did not challenge these agency determinations. Instead, it accepted the determinations, shut down the Facility, and sought just compensation.

In sum, a statutory scheme exists by which operators of solid waste disposal sites and facilities must obtain a CD. Heartland did not follow that process. And Heartland does not cite any facts that create a genuine dispute on whether it obtained a CD by transfer.

## B.

Heartland next argues that the district court erred by granting summary judgment on causation and abused its discretion by excluding causation evidence.

First, Heartland says that the district court improperly ruled on causation sua sponte. It suggests that A-1's summary judgment brief did not put it on notice that it might need to come forward with its causation evidence. We disagree.

A-1's summary judgment papers plainly seek summary judgment on liability and a desire to "narrow[ ] the scope of trial in this action to a determination of the amount [of] damages suffered by A-1." Appellant's App. Vol. IV at 24. And Heartland's response to A-1's motion says: "this case is rife with disputed issues of material fact *relating to causation*[.]" Appellant's App. Vol. V at 171 (emphasis added). It thus belies reason for Heartland to now argue that the district court ruled on causation without notice.

What's more, the district court did not rule that "any damages A-1 suffered resulted from Heartland's breach." Rather, the district court properly understood that it would be up to the jury to determine what damages A-1 suffered because of Heartland's breach. See Appellant's App. Vol. IX at 67 ("A jury trial on the total amount of [A-1]'s damages stemming from [Heartland]'s breach of the agreements is set for November."). Indeed, the jury was asked whether "A-1 prove[d], by a preponderance of the evidence, that it incurred damages as a result of Heartland's breach of the contracts." Appellant's App. Vol. X at 243. So, contrary to Heartland's view, the district court did not undermine the requirement that A-1 "show by a preponderance of the evidence that the injury would not have occurred but for [Heartland's] . . . conduct." Appellant's Br. at 30 (quoting Strock v. USA Cycling, Inc., No. 00-CV-2285-JLK, 2006 WL 1223151, at *6 (D. Colo. May 8, 2006)).

Simply stated, we do not agree with Heartland's characterization of the district court's summary judgment order as inconsistent with the facts or law.

Nor do we agree with Heartland that the district court abused its discretion by excluding certain causation evidence. To start, we review the exclusion of evidence for abuse of discretion. Leprino Foods, 453 F.3d at 1287. A district court abuses its discretion "only when it makes a clear error of judgment, exceeds the bounds of permissible choice, or when its decision is arbitrary, capricious or whimsical, or results in a manifestly unreasonable judgment." Mathis v. Huff & Puff Trucking,

13

Inc., 787 F.3d 1297, 1309 (10th Cir. 2015) (quoting Queen v. TA Operating, LLC, 734 F.3d 1081, 1086 (10th Cir. 2013)).

Heartland sought to introduce evidence that BOCC and CDPHE caused some portion of A-1's damages.  But the district court excluded causation evidence on BOCC and CDPHE because: (1) earlier in the case, the district court granted the parties' joint motion asking that Heartland's designation of BOCC and CDPHE as non-parties at fault be withdrawn with prejudice; (2) the probative value of Heartland's desired evidence was substantially outweighed by the danger of confusing the issues, misleading the jury, undue delay, and wasting time; and (3) either party could seek redress against BOCC or CDPHE if warranted, but such claims were not relevant to the damages in this breach of contract case.[6]

According to Heartland, the district court's first rationale blurred the distinction between tort and contract law.  That is, the non-party-at-fault designation applies only to tort claims and the parties agreed to the withdrawal because A-1 dismissed its tort claims.  But the district court was concerned about reinserting entities into the litigation at a late stage when its prior order removed them—and Heartland cites no case law to convince us that the district court's concern was an abuse of discretion.

---

[6] In Colorado state district court, Heartland Biogas, LLC sued CDPHE and BOCC on the question of whether an unconstitutional regulatory taking occurred. The state court concluded that no taking occurred and entered judgment in favor of CDPHE and BOCC on April 28, 2023.

On probative value, Heartland says that causation evidence was highly relevant and that the district court should have permitted Heartland to disprove A-1's position on causation. In support, Heartland cites a single case from the District of Colorado, in which the district court denied summary judgment because of an open question on the cause of roof damage in an insurance case. See 5555 Boatworks Drive LLC v. Owners Ins. Co., No. 16-CV-02749-CMA-MJW, 2017 WL 6361398, at *4 (D. Colo. Dec. 13, 2017). That case did not involve a Federal Rule of Evidence 403 analysis, or a question whether the district court abused its discretion in conducting a Rule 403 analysis. So, once again, we are left with no more than Heartland's word that the district court got it wrong. That is not enough to show an abuse of discretion. See Monfore v. Phillips, 778 F.3d 849, 854 (10th Cir. 2015) ("Appellate courts review evidentiary complaints only for abuse of discretion, and the degree of a district court's discretion in evidentiary rulings under Rule 403 is 'particularly' wide." (quoting Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008))).

Finally, Heartland argues that the district court did not support the third rationale—that either party could seek redress against BOCC or CDPHE if warranted—with authority or analysis, so it abused its discretion. The district court did explain, however, that it viewed the conduct of BOCC and CDPHE "not relevant to the expectation damages that are at issue in this breach of contract case." Appellant's App. Vol. IX at 75–76. And, as above, Heartland cites no case law to

15

support its stance or convince us the district court's relevance determination was an abuse of discretion.

C.

Heartland next asks us to reverse the jury's award of lost tipping and marketing fees under the Lease and SSA.  The jury awarded A-1 roughly $6 million in damages—a sum consisting of around $2.4 million in tipping fees, $2.7 million in lost marketing fees, and $900,000 in diversion damages.[7]  Heartland argues that because A-1's tipping and marketing fees both constitute consequential damages, and because both the Lease and the SSA contain clauses purporting to waive consequential damages, the district court should have barred A-1 from recovering those damages.  A-1 responds that the district court properly concluded that neither agreement disallowed consequential damages.  And, alternatively, A-1 contends that the tipping and marketing fees are both direct damages under the SSA.

Under Colorado law, we interpret contracts to best effectuate the parties' intent.  See Allen v. Pacheco, 71 P.3d 375, 378 (Colo. 2003).  To do so, we look to the plain meaning of the contract's language, giving effect to all provisions so that none will be rendered meaningless.  Copper Mountain, Inc. v. Indus. Sys., Inc., 208 P.3d 692, 697 (Colo. 2009) (first citing E. Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co., 109 P.3d 969, 974 (Colo. 2005); and then citing Pepcol Mfg. Co.

---

[7] On appeal, Heartland does not challenge the evidentiary support for diversion damages.  Because we affirm on liability, Heartland does not contest that A-1 is entitled to the $868,378.00 in diversion damages.

16

v. Denver Union Corp., 687 P.2d 1310, 1313 (Colo. 1984)).  If the contract's plain

language is unambiguous, we will enforce its terms, as "courts should neither rewrite

the agreement nor limit its effect by a strained construction."  Allen, 71 P.3d at 378

(citing State Farm Mut. Auto. Ins. Co. v. Stein, 940 P.2d 384, 387 (Colo. 1997)).

Both the SSA and the Lease contain language purporting to limit liability for

consequential damages.  We begin with the SSA:

> **10.4** *Consequential and Incidental Damages*. In no event will the
> Parties hereto . . . be liable to the other Party . . . for any consequential,
> incidental, indirect, punitive or special damages (including loss of
> profits, data, business or good will) in connection with the performance
> of this Agreement, whether or not liability is based on breach of
> contract, tort, strict liability, breach of warranty, failure of essential
> purpose or otherwise, and even if such Party is advised of the likelihood
> of such damages; provided that the foregoing waiver shall not apply to
> indemnification obligations contained herein or liability arising from a
> Party's willful misconduct.

Appellant's App. Vol. XII at 132.  The district court reasoned that because the parties

tucked this clause under the "indemnification" heading, the parties intended

§ 10.4 to only apply to disputes involving claims against A-1 or Heartland brought by

third parties.  We disagree.

Section 10.4's language is clear and unambiguous.  The first half of the clause

plainly instructs that A-1 and Heartland will never be liable to each other for any

consequential damages resulting from the parties' performance of the SSA.   The

second half carves out two limited exceptions, neither of which A-1 alleges apply.

One cannot read this provision's text any other way.  Because § 10.4's language is

not "reasonably susceptible to more than one meaning," see Public Service Company

of Colorado v. Meadow Island Ditch Company Number 2, 132 P.3d 333, 339 (Colo. 2006), the district court should have enforced § 10.4 as written.

Instead, the district court relied primarily on the parties' placement of § 10.4 under the "indemnification" heading to infer that § 10.4 applies only to claims brought by third parties. But a broad heading cannot override the specific language of a particular clause. And in any event, the SSA expressly instructs that "headings in this Agreement are for convenience of reference only and do not affect the meaning or interpretation of this Agreement." Appellant's App. Vol. XII at 124. Federal courts sitting in Colorado have respected this clause in the past. See Sola Salon Studios, LLC v. Heller, No. 08-CV-01565-PAB-BNB, 2012 WL 917281, at *3 (D. Colo. Mar. 19, 2012) (heading of attorney-fee paragraph was "irrelevant" where lease stated headings were "of no effect"). A-1 cites no contrary authority. As a result, we conclude that the district court erred in determining that A-1 can recover consequential damages under the SSA.

But the Lease presents a different story. The Lease's consequential damages exclusion reads:

> Section 16.02 Indemnity by Lessor. The Lessor Parties [Heartland] shall not be liable for losses of rent, business opportunities, profits or any other consequential damages *that may result from the conduct of Lessor Parties' activities on the Property*.[8]

---

[8] The Lease defines "Property" to mean the Demised Land and all Improvements located thereon from time to time during the Term in accordance with the provisions of this Lease.

Appellant's App. Vol. XII at 84 (emphasis added). Like the SSA, this clause also appears under an indemnification heading. And for that reason, the district court again reasoned that the parties intended the Lease's consequential damages exclusion to apply only to claims brought by third parties. But unlike the SSA, the Lease only bars consequential damages resulting from Heartland's activities *on the property*. Because of that language, the district court alternatively concluded that A-1 could recover consequential damages under the Lease flowing from Heartland's failure to obtain a CD because those damages did not result from Heartland's activities on the property.

But in its opening brief, Heartland only challenges the district court's first conclusion—that § 16.02 applies to third-party claims. Heartland does not argue that the court erred by finding that A-1's consequential damages flowed from conduct off Heartland's property. Nor does Heartland argue that A-1's damages flowed only from the SSA. As a result, Heartland has waived these issues.[9] See Anderson v. U.S. Dep't of Lab., 422 F.3d 1155, 1174 (10th Cir. 2005) (citing State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994)). And "[w]hen an appellant does not challenge a district court's alternate ground for its ruling, we may affirm the ruling." Starkey ex rel. A.B. v. Boulder Cnty. Soc. Servs., 569 F.3d 1244, 1252 (10th Cir. 2009) (citing Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 877 (10th Cir.

---

[9] To be clear, because of A-1's waiver, we do not reach the merits of whether the district court correctly determined that the Lease allowed A-1 to recover consequential damages flowing from Heartland's off-property activities.

2004)).   Thus, because Heartland fails to challenge the district court's alterative

conclusion that the Lease allowed A-1 to recover consequential damages flowing

from Heartland's off-property activities, Heartland fails to demonstrate reversible

error.

D.

We turn now to Heartland's challenges to the district court's decisions on lost

profits evidence and jury instructions.  Heartland first argues that the district court

erred in denying its motion for judgment as a matter of law because A-1 failed to

introduce legally sufficient evidence to support the jury's award of lost profits.

Heartland next contends that the district court abused its discretion by admitting

A-1's damages evidence.  Heartland lastly submits that the district court erroneously

instructed the jury by failing to include two instructions concerning substitute

transactions and cost savings.

Our analysis begins and ends with the district court's admission of A-1's lost

profits evidence.  Heartland contends that the district court violated Federal Rule of

Evidence 701(c) by allowing Bahnsen, A-1's CFO, to give lay opinion testimony

about A-1's projected profits.  We agree.

Federal Rules of Evidence 701 and 702 govern opinion testimony offered by

lay and expert witnesses.  Under Rule 701, a non-expert, or "lay," witness may offer

"observations [that] are common enough and require . . . a limited amount of

expertise, if any."  See James River Ins. Co. v. Rapid Funding, LLC, 658 F.3d 1207,

1214 (10th Cir. 2011) (quoting United States v. VonWillie, 59 F.3d 922, 929 (9th

20

Cir. 1995)); Fed. R. Evid. 701.  Lay witnesses' opinions, however, cannot be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701(c).  Common examples of proper lay opinions include "the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences." James River, 658 F.3d at 1214 (quoting Asplundh Mfg. Div. v. Benton Harbor Eng., 57 F.3d 1190, 1196 (3d Cir.1995)).

Rule 702, in turn, governs testimony from experts—those with scientific, technical, or specialized knowledge in a particular field qualifying them to offer their expert opinion on a disputed factual issue.  See LifeWise Master Funding v. Telebank, 374 F.3d 917, 928–29 (10th Cir. 2004).  Under Rule 702, the trial judge must find "that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact," before allowing the expert to testify.  United States v. Rodriguez-Felix, 450 F.3d 1117, 1122 (10th Cir. 2006) (citing Fed. R. Evid. 702). "This principle 'applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge.'"  United States v. Benally, 541 F.3d 990, 994 (10th Cir. 2008) (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999)).

The district court admitted Bahnsen's testimony under Rule 701, not 702.  A-1 contends that the district court's decision is supported by one of the advisory committee notes to Rule 701.  That note reads:

21

> [M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. Such opinion testimony is admitted *not because of experience, training or specialized knowledge* within the realm of an expert, but because of the *particularized knowledge that the witness has by virtue of his or her position in the business*. The amendment does not purport to change this analysis.

Fed. R. Evid. 701 advisory committee's note to 2000 amendment (emphasis added). And consistent with that note, courts continue to adhere to the pre-amendment practice of allowing business owners or officers to offer lay opinions—so long as they base their opinions on particularized knowledge derived from their position in the business. See, e.g., Ryan Dev. Co. v. Ind. Lumbermens Mut. Ins. Co., 711 F.3d 1165, 1170 (10th Cir. 2013) (permitting accountants to testify as lay witnesses given their involvement preparing the plaintiff's proofs of loss); Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73, 81 (3d Cir. 2009) ("[W]e have consistently required that lay testimony requiring future projections of a business or operation come from someone who has intimate and thorough knowledge of the business[.]"); State Off. Sys., Inc. v. Olivetti Corp. of Am., 762 F.2d 843, 846 (10th Cir. 1985) (concluding lay witness's position as the business's president and treasurer, lengthy experience in the industry, and personal knowledge of the business qualified him to render an opinion for lost future profits).

At the same time, we have also held that the advisory committee's note about business owners does not allow a trial court to admit Rule 702 testimony under Rule 701. See, e.g., James River, 658 F.3d at 1216; LifeWise, 374 F.3d at 929–30.

Indeed, Rule 701's advisory committee notes emphasize that the Rules Committee added Rule 701(c) to "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 advisory committee's note to 2000 amendment. Thus, we have allowed only business owners to offer lay opinions about lost profits when they have sufficient personal knowledge "of their respective businesses and of the factors on which they relied to estimate lost profits" or "offer[] valuations based on straightforward, common sense calculations." James River, 658 F.3d at 1216 (quoting LifeWise, 374 F.3d at 929–30).

We conclude that Bahnsen's testimony at trial went beyond what Rule 701 allows for two main reasons. First, Bahnsen's testimony involved far more than basic math "well within the ability of anyone with a grade-school education." Id. at 1214 (quoting Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1124 (10th Cir. 2005)). Through Bahnsen, A-1 introduced complex economic forecasts Bahnsen prepared projecting A-1's expected return on a $14 million investment over a twenty-year term. To estimate twenty years of lost profits, Bahnsen had to make complicated assumptions and projections about how the market for A-1's substrates would change over time. For example, Bahnsen testified that he analyzed multiple market scenarios involving A-1 using the substrates in different ways. And for each individual year in his final forecasts, Bahnsen necessarily had to project the volume of raw materials A-1 could acquire; the costs of processing those materials into marketable products; the prices at which A-1 could sell those products; and the amounts that A-1 could sell.

23

Bahnsen then had to account for how those variables might change over a twenty-year term. This level of economic analysis is a far cry from the basic arithmetic we allow parties to offer under Rule 701. See id.; Ryan Dev. Co., 711 F.3d at 1170–71.

Second, Bahnsen explicitly based his projections on knowledge he derived from previous professional experience creating budget forecasts. He testified that he relied on his experience working as a Certified Public Accountant ("CPA") for a major accounting firm. He also told the jury about his experience working for other large companies where he did other types of economic projections and forecasts. And Bahnsen's reliance on his earlier experience makes sense because A-1 only hired Bahnsen six months before he put together his projections. But ultimately, Bahnsen's "[k]nowledge derived from previous professional experience falls squarely within the scope of Rule 702 and thus by definition outside of Rule 701." James River, 658 F.3d at 1215 (quoting United States v. Smith, 640 F.3d 358, 365 (D.C. Cir. 2011)).

Thus, the district court should not have admitted Bahnsen's testimony and projections under Rule 701. He based his testimony on his professional experience and financial expertise, not particularized knowledge obtained through his six months working for A-1. And by allowing him to testify under Rule 701, the district court allowed A-1 to place Bahnsen's economic forecasts before the jury without first satisfying Rule 702's reliability requirements. The district court abused its discretion by doing so. Id. at 1216.

24

Without Bahnsen's testimony and projections, we do not see any evidence on which the jury could have based its damages verdict for lost tipping and marketing fees, and the district court erroneously denied Heartland's motion for judgment as a matter of law.[10]  We have three options: "(1) order a new trial at the verdict winner's request or on [our] own motion, (2) remand the case for the trial court to decide whether a new trial or entry of judgment for the defendant is warranted, or (3) direct the entry of judgment as a matter of law for the defendant."  Weisgram v. Marley Co., 528 U.S. 440, 451–52 (2000) (citing Neely v. Martin K. Eby Const. Co., 386 U.S. 317, 327–30 (1967)).  Given the nature of this case, we remand the case for the district court to decide whether a new trial on damages or entry of judgment for Heartland is warranted.[11]  The district court has already issued multiple rulings cabining the testimony in this case, it has the most intimate knowledge of the record, and we believe that it is best suited to determine whether a new trial or judgment for Heartland is warranted.  Accordingly, we remand to the district court for it to make this determination.[12]

---

[10] To be sure, A-1 argues neither harmlessness nor alternative bases for the jury's damages verdict.

[11] Because we remand on this basis, we do not reach the sufficiency and jury instruction issues.

[12] We note that the jury's diversion damages verdict for $868,378.00 remains. We remand to the district court, however, to recalculate the appropriate amount of fees and costs because of our decision to vacate the majority of the jury's damages award.

IV.

In sum, we AFFIRM the district court's grant of summary judgment on Heartland's liability.  We also AFFIRM the district court's decision that A-1 could recover consequential damages.  But we VACATE the jury's damages verdict as to lost tipping and marketing fees and REMAND to the district court for further proceedings not inconsistent with this Order and Judgment.

Entered for the Court


Joel M. Carson III
Circuit Judge